## Walker Estate

*Moore, James, Wright & Gibbons,* for accountant.

KLEIN, P. J., February 1, 1962.—Thomas P. Walker died on March 31, 1950, leaving a will and codicil by

which, inter alia, he bequeathed $50,000 to his executor in trust to pay the net income therefrom to his sister-in-law, Magadalen Fox Bieg, and her husband, Oscar H. Bieg, for their lives and the life of the survivor, and upon the death of the survivor of them to pay over the principal, together with any and all accumulated income, equally, share and share alike, to his nephews, Robert J. Walker and Joseph C. Walker, and to Charles Fox and Katherine Fox Rock, with further provisions to become operative in the event any of said remaindermen should die before the death of the life tenants.

The fund presently accounted for was awarded to the present accountant by adjudication of Bolger, J., dated February 15, 1951, and the occasion of the filing of the present account was the death on September 19, 1961, of Magdalen Fox Bieg, surviving life tenant, her husband, Oscar H. Bieg, having predeceased her on December 31, 1959, and the resulting termination of the trust.

Robert J. Walker, Joseph C. Walker, Charles Fox, stated to be also known as Charles Fox, II, and Katherine Fox Rock, remaindermen, all appear to be living and of age.

All parties in interest appear to have had notice of this audit.

Joseph C. Walker, entitled to one-fourth of the principal in remainder, objected to the allowance of the fee of $1,375, to Moore, James, Wright & Gibbons, counsel for the accountant, as credited in the account. No objection was made to the fee by Robert J. Walker, Charles Fox, II, and Katherine Fox Rock, the remaindermen, entitled to the other three-fourths of the estate.

It appears from the study of this record that David B. James, Jr., a member of the law firm of Moore,

James, Wright & Gibbons, was counsel for testator. He, apparently, was scrivener of the will and codicil, as he was a subscribing witness to both documents. Mr. James, who died in 1960, was one of the most respected and trusted members of our bar and a recognized expert in the field of law pertaining to decedents' estates.

The original principal of this trust of $50,000, awarded by adjudication of Bolger, J., dated February 15, 1951, has almost doubled in amount, as a result of the excellent administration of the estate by Fidelity-Philadelphia Trust Company, the accountant, with the helpful advise of counsel.

Mr. Wright, who was associated with Mr. James, made a statement at the audit as to the nature and extent of the services for which the fee was charged. Included in these services were some resulting from an attachment issued by Joseph C. Walker, the objectant, upon a judgment he secured against his brother, Robert J. Walker, who is also a beneficiary.

Apparently, one of testator's primary purposes in creating this trust was to benefit his sister-in-law, Magdalen Fox Bieg, and her husband, Oscar H. Bieg, who were also represented by Mr. James. Following the death of Mr. Bieg, Mr. James performed unusual and extraordinary services in behalf of the surviving wife. He received the income from the trust and with it paid all her bills, hired nurses and maintained her apartment. In addition to this, Mr. James and his associates performed the usual services required in a trust estate of this size and duration.

The law is an honored and respected calling, and the maintenance of high professional standards is important to the welfare of the community. To maintain these high standards, it is essential that members of the profession have adequate economic safeguards.

Although most of our citizens have been affected by the reduced purchasing power of the dollar, resulting from the inflationary trends to which we have been subjected, lawyers have suffered more than other professional people. Thirty years ago, the average income of lawyers in the United States was higher than that of physicians. Since that time, the situation has been sharply reversed. Statistics available at the end of 1956, indicate that the median annual income of lawyers was $7,833, contrasted with $16,071, for members of the medical profession.* Similarly, the increase in the income of persons engaged in the other professions and in industry has been comparatively very much higher.

In a pamphlet entitled "Lawyers' Economic Problems", prepared for the American Bar Association in 1959, we find the following statement at page 23:

"Other professions, such as doctors, dentists, engineers and architects, have either adopted advisory fee schedules or their fees have become so standardized by custom, as in the case of architects, as to be tantamount to recommended minimums. An architect's fee, on a percentage basis, is standard and customary, and being a percentage, his fee automatically increases with rising costs."

To combat the economic problems confronting the legal profession, the bar associations of 14 States have adopted Statewide advisory schedules and more than half of the 1,300 local bar associations throughout the country have adopted some sort of fee schedules.

The American Bar Association pamphlet, to which reference is made above, states further:

---

* Professional income: "Why Doctors Make More Money Than Lawyers," by Lee Loevinger, American Bar Association Journal, July 1958, page 615.

"Advisory minimum fees, by monetary evaluations of the elements set forth in Canon 12 of the Canons of Professional Ethics, should be sufficient to enable the lawyer to occupy creditable office quarters and to pay his reasonable overhead expenses; to preserve a satisfactory credit rating by prompt payment of his bills; to maintain himself and his dependents in accordance with a fair standard of living, representative of the legal profession in his community and in some fair measure, to provide for his future and that of his dependents."

The Professional Ethics Committee of the American Bar Association in opinion no. 302, recently filed, which appeared in The Legal Intelligencer of December 26, 1961, ruled that the habitual charging of fees less than those established by a minimum fee schedule, or the charging of fees without proper justification, may be evidence of unethical practice. We agree with this conclusion and concur in the following statement found in the committee's opinion:

"The establishment of suggested or recommended minimum fee schedules by bar associations is a thoroughly laudable activity. The evils of fee cutting ought to be apparent to all members of the bar. . . . When members of the bar are induced to render legal services for inadequate compensation, as a consequence the quality of the service rendered may be lowered, the welfare of the profession injured and the administration of justice made less efficient. . . . It is proper for the profession to combat such evils by suggested or recommended minimum fee schedules and other practices which have a tendency to discourage the rendering of services for inadequate compensation. Such schedules represent the judgment of the local or State bar association as to what constitutes the minima for reasonable charges for legal services,

and should be regarded by the lawyers and the public in the community."

In our opinion, a presumption arises when counsel fees are requested in accordance with the suggestions contained in a minimum fee schedule adopted by the bar association of the locality, that such fees are fair and equitable and the burden of establishing that such fees are excessive rests upon the person who is objecting thereto: Magaziner Estate, 9 D. & C. 2d 457 (1957). See also Heltzel's Estate, 52 D. & C. 337 (1945). Although such fee schedules are not binding or conclusive, they should receive the most careful consideration by the courts. Occasionally, a case may arise in the orphans' court where the fees suggested in the schedule might be regarded as excessive, but such cases are rare. On the contrary, in many cases, the suggested fees are wholly inadequate.

The following statement found in Hanley v. Waxman, 80 Pa. Superior Ct. 274, 276 (1922), and cited with approval in Huffman Estate (No. 3), 349 Pa. 59 (1944), at page 64, indicates the yardstick to be used, when measuring the value of services rendered by an attorney:

"The things to be taken into consideration in determining the compensation to be recovered by an attorney are the amount and character of the services rendered, the labor, the time, and trouble involved, the character and importance of the litigation, the amount of money or value of the property affected, the professional skill and experience called for, and the standing of the attorney in his profession; to which may be added the general ability of the client to pay and the pecuniary benefit derived from the services."

The Philadelphia Bar Association adopted a revised minimum fee schedule on October 2, 1959. The fee of $1,375, charged by counsel in the present case is in conformity with this schedule. The auditing judge is

quite satisfied that it is fair and reasonable, under all of the circumstances, and is fully justified under the standards set forth in Hanley v. Waxman, supra. Moreover, nothing is contained in the statements of Joseph C. Walker at the audit to warrant its reduction. His objections are therefore dismissed. . . .

And now, February 1, 1962, the account is confirmed nisi.